UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Welcome Hotels, Inc., | ) | Civil Action No. 9:02-2085-SB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | **FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW** |
| Meybohm and Associates, Inc., | ) | **AND JUDGMENT** |
| d/b/a Meybohm, | ) | **ON BENCH TRIAL** |
| | ) | |
| Defendant. | ) | |



## I. INTRODUCTION

The controversy in this action arises out of the development and construction of the Hilton Garden Inn Bluffton, a hotel located on Highway 278 at the gateway to Hilton Head Island, South Carolina. G.S. Partners of Hilton Head, LLC is the owner and developer of the property in question. The Plaintiff, Welcome Hotels, Inc., operated as the management services provider for the project. The Defendant, Meybohm & Associates, Inc. ["Meybohm"], was hired to act as general contractor for the construction.

This action was originally filed in North Carolina state court. After the Defendant removed the matter to the United States District Court for the Eastern District of North Carolina, its request for change of venue to this Court was granted.[1]

---

[1] By agreement of the parties, two related state court actions were transferred to this Court, to be resolved by any judgment arising out of the bench trial in this case. Both were filed in the Court of Common Pleas for Beaufort County: (a) Welcome Hotels, Inc. and G.S. Partners of Hilton Head, L.L.C. v. Meybohm Assoc., Inc.; C.A.# 2002-CP-07-1429; (b) Meybohm & Assoc., Inc. v. Welcome Hotels, Inc.; G.S. Partners of Hilton Head, L.L.C.; Trugreen Landcare, LLC; and Wachovia Bank, N.A., C.A.# 2002-CP-07-1779. By consent, Trugreen Landcare and Wachovia Bank were dismissed as parties.

In addition, a separate action has been filed in this Court, arising out of the construction at

The remaining issues before the Court are as follows:

• By the Plaintiff: (1) breach of contract; (2) failure to complete work in accordance with the contract documents – which is subsumed within a claim for breach of contract; (3) breach of express warranties; and (4) breach of implied warranties.

• By the Defendant: (1) foreclosure of mechanics' lien; (2) breach of contract; (3) quantum meruit; (4) negligent misrepresentation; (5) violation of the South Carolina Improvements to Real Estate Act; and (6) breach of contract accompanied by a fraudulent act.[2]

This matter came before the Court for bench trial on April 2, 3 and 4, May 5, 6, 19, 21, 22, 28 and 29, and July 22 and 23, 2003. The transcript of proceedings consists of 2,212 pages, and the exhibits submitted by the parties number more than 3,000 pages. At the close of the evidence, the Court directed the parties to submit proposed findings of fact and conclusions of law, as well as a proposed judgment, in an effort to more efficiently identify and resolve the issues. The Defendant submitted its proposal on November 30, 2004, and, after requests for extension were granted, the Plaintiff submitted its proposal on March 10, 2005.

Now, pursuant to Federal Rule of Civil Procedure 52(a), the Court finds and concludes as follows:

---

issue in this case. See Venture Projects, Inc. v. Welcome Hotels, Inc., Civil Action No. 9:03-1107-SB. The judgment in this action has no direct effect on the Venture Projects case.

[2] During the trial of the case, Meybohm voluntarily dismissed a cause of action for violation of the South Carolina Trade Practices Act.

## II. FINDINGS OF FACT

### A. The Parties

1. Plaintiff Welcome Hotels, Inc., ["Welcome"] is a Nevada corporation, formed in 1996. Its stock is solely owned by Dicky S. Walia ["Walia"], who is the President and Chief Executive Officer. Welcome is a non-asset management company which is strictly a development and management entity employing a corporate staff to oversee the development and management of hotels.

2. Defendant Meybohm & Associates, Inc., ["Meybohm"] is a Georgia corporation formed in 1988. Seventy percent of its stock is owned by Robert L. Meybohm ["Bobby Meybohm"], and the remaining thirty percent is owned by Rodney Attaway. Meybohm is a licensed general contractor in South Carolina and builds commercial and industrial projects throughout the southeastern United States.

3. Meybohm has constructed over 300 projects, approximately 30 of which are hotel projects built in the five years prior to trial, for franchise names such as Hampton Inn, Holiday Inn Express, Quality Suites, Comfort Suites, Homeward Suites and Hilton Garden Inn.

4. Plaintiff G.S. Partners of Hilton Head, LLC ["GS Partners"] is a North Carolina entity formed solely for the purpose of owning and developing the parcel of real estate on which the hotel at issue was constructed. Walia is the Manager under Article 4.2 of the Operating Agreement. In addition to Walia, the other members in GS Partners, as listed in Article 4.1 of the Operating Agreement, are Dr. Harinderjit D. Singh, a surgeon from Augusta, Georgia; Dr. Kaplan Rawal, a physician from Raleigh, North Carolina; and his wife Romana Nathaniel Rawal.



5. Dr. Singh hired Meybohm as the general contractor for a number of other hotel and office projects, both prior and subsequent to the Hilton Garden Inn project. Bobby Meybohm is a joint owner with Dr. Singh in several of these projects.

6. Welcome acted as the developer for the Hilton Garden Inn for GS Partners and manages the day to day operations of the hotel. Under paragraph 2 of the Management Contract, GS Partners appointed Welcome as the owner's agent to supervise and manage the hotel for a fee of 5% of the total gross revenues of the hotel. In addition to this management fee, Walia was given a credit of $375,000.00 as a personal management fee, which was applied to his equity contribution in GS Partners and used as equity in the project for financing purposes.[3]

B. Initial Negotiations

7. The Hilton Garden Inn Project in Bluffton, South Carolina was first bid in December, 1999, using plans and specifications dated December 15, 1999. Five general contractors submitted proposals for the project, at costs ranging from $6,442,724.00 to $7,594,532.00.

8. GS Partners hired Project A.R.C. ("ARC"), whose principals are former employees of the Hilton Corporation, to advise the owner as to changes that could be made to bring the project closer to the owner's budget, and to act as the Owner's Representative on the project.

9. After ARC suggested that a number of "value-engineering" modifications

---

[3] Because Welcome was intimately involved with the project on the owner's side, the Court will use the name "Welcome" when referring to decisions made by GS Partners through Walia.

4

could reduce the cost of construction (Exhibit 21), the project was bid out a second time on January 28, 2000. The second set of bids ranged from Meybohm's low bid of $6,154,483.00 to a high bid of $7,332,379.00.

10. After the second bid, Meybohm was selected to be the general contractor for the project. The owner requested that Meybohm work with William Gullion ["Gullion"] of ARC to help find additional ways to further reduce the cost of the project. Meybohm was directed to provide final pricing for the contract without having completed Mechanical, Electrical and Plumbing (MEP) drawings, in order that the financing could be closed and the project could break ground by April 6, 2000.

11. Gullion directed Meybohm to reduce the estimated allowance for kitchen equipment to $75,000.00, and required Meybohm to purchase and install all kitchen equipment even though this work was not part of Meybohm's bid proposal. Gullion further directed Meybohm to construct CMU support walls so that a different entry lift could be utilized, and to make additional changes to the MEP design.

12. At a meeting in Raleigh, North Carolina, Walia prepared a handwritten contract using the form AIA Document A101-1997. At this point, Meybohm's estimated construction cost was $5,856,000.00, after revisions to pricing made since Meybohm's second bid of $6,154,083.00.

13. The last page of this document is a handwritten page prepared by Walia which lists several reductions in line item costs, bringing the price down from $5,856,000.00 to $5,720,000.00. One of these line items reads "Rebate from Meybohm: $70,000.00," reflecting an agreement by Meybohm to reduce the



overhead and profit shown on its estimate from $320,000.00 to $250,000.00. Other additional savings items listed on the document include not requiring a construction bond ($40,000.00), savings on insurance of $7,000.00, savings on kitchen equipment of $7,000.00 and savings on furnishings of $11,250.00.

14. Walia indicated on the document that the "contract price" for construction would be $5,600,000.00 although the estimate, even after the deductions, still reflected a price of $5,720,450.00. Underneath the line showing "Contract Price $5,600,000.00," Walia wrote the following sentence:

> Balance to be adjusted
> in future contracts
> subject to any credits
> received after final
> drawings submitted          $120,450

15. Following the April 16, 2000, meeting in Raleigh, Walia prepared two typewritten contracts. The first was a typewritten version of AIA Document A101-1997, dated April 20, 2000 (Exhibit 39); the second document was entitled "Agreement of Understanding," also dated April 20, 2000 (Exhibit 41).

16. Although the contract price at that time was well over $5.6 Million, Walia informed Meybohm that the bank would only agree to a construction loan of $5,300,000.00. This amount is the most that could be shown on any future construction document reviewed by the bank. As a result, the contract sum shown in Article 4.1 of Exhibit 39 was $5,300,000.00.

17. The Agreement of Understanding was developed as a side agreement between Meybohm and Welcome, memorializing that Meybohm would be paid for the full contract price, despite the numbers given to the bank. The bank was



unaware of this side agreement until after commencement of this litigation.

18. Welcome agreed to remove the responsibility of furnishing and installing kitchen and laundry equipment from Meybohm, choosing instead to independently contract with a third party. The new total contract price agreed to by the parties was $5,653,700.00.

19. Exhibits 39 and 41 form the binding agreement between the parties,[4] and must be read together; thus, the contract amount for construction of the Hilton Garden Inn agreed to by the parties on April 20, 2000 was $5,653,700.00, subject to adjustments properly applied for and approved under the contract documents.

20. The agreement (specifically Exhibit 39) also provides that "AIA Document A201-1997, General Conditions of the Contract for Construction, is adopted by reference." Those general conditions (Exhibit 40) are an integral part of the contracts entered into by the parties and are also part of the parties' agreement.

## C. The Agreement; General Provisions

21. Under the Agreement, the date of commencement of work is listed as May 1, 2000. The Agreement further required Meybohm to achieve "substantial completion" of the work within 360 days from the date of commencement.

22. After giving a two-week grace period, the Agreement imposes "liquidated damages" upon Meybohm at the rate of $2,000.00 per day for not achieving substantial completion within the prescribed time. Conversely, the Agreement grants



---

[4] It is undisputed that Walia, on behalf of Welcome, signed these agreements as agent for GS Partners.

7

Meybohm a "bonus" of $1,000.00 per day (not to exceed $30,000.00) for completion within the 360-day period.

23. Under the Agreement, Welcome was required to submit "final payment" to Meybohm if Meybohm has "fully performed the Contract except for the Contractor's responsibility to correct work," and if "a final Certificate for Payment has been issued by the Architect." Final payment was due within 30 days after the Certificate of Payment had been issued, or "twenty (20) days after the final punch list completion and sign off, and on submission of all lien waiver documents and as built plans, and meeting all other contractual obligations. Sign off [sic] architect, bank, and Project ARC, Inc. will be required." Further,

> Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
> 1.5% per month

24. Under the General Conditions incorporated into the Agreement (Exhibit 40), the following conditions apply to final payment:

9.10   FINAL COMPLETION AND FINAL PAYMENT

9.10.1 Upon receipt of written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Architect will promptly make such inspection and, when the Architect finds the Work acceptable under the Contract Documents and the Contract fully performed, the Architect will promptly issue a final Certificate for Payment stating that to the best of the Architect's knowledge, information and belief, and on the basis of the Architect's on-site visits and inspections, the Work as been completed in accordance with the terms and conditions of the Contract Documents and that the entire balance found to be due the Contractor and noted in the final Certificate is due and payable. . . .

9.10.2 Neither final payment nor any remaining retained percentage



8

shall become due until the Contractor submits to the Architect (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered . . . have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Contract Documents to remain in force after final payment is currently in effect and will not be canceled or allowed to expire until at least 30 days' prior written notice has been given to the Owner, (3) a written statement that the Contractor knows of no substantial reason that the insurance will not be renewable to cover the period required by the Contract Documents, (4) consent of surety, if any, to final payment and (5), if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, releases and waivers of liens, claims, security interests or encumbrances arising out of the Contract, to the extent and in such form as may be designated by the Owner. . . .

25. The Agreement, via typewritten additions to the form contract, provides that "In the event of any dispute, owner shall within ten (10) days exercise his option to either resolve the dispute through arbitration to [sic] the rules of AAA or choose to litigate the disputed matter in Wake County, NC[.] NC law shall apply."

26. The Agreement further provides that "Any additions or alterations performed by the contractor shall be considered as part of the lump sum contract and will not be an additional expense to the Owner, unless and until an estimate is submitted by the contractor and approved by Owner in writing prior to commencement of such work."

27. The Agreement provided for a one-year "warranty" period, during which Meybohm – after being given sufficient notice – could be called back to the site by Welcome to repair any known defect, at no additional cost to Welcome.



9

### D. Summary of the Controversy; Amounts Disputed and Not Disputed

28. It is undisputed that the Hilton Garden Inn project opened for business on July 31, 2001, under a temporary certificate of occupancy, which constitutes "substantial completion" under the Agreement.

29. There is also no dispute that the original contract amount, before change orders, extra work orders and set-offs, was $5,653,700.00.

30. The parties agree that Meybohm is entitled to money over and above the original contract amount as a result of change orders and extra work orders approved by Welcome. There are, however, many disputes as to how much money Meybohm is owed for these change orders and extra work orders, and how much of this amount should be set off due to inferior or improper workmanship, consequential damages resulting from such workmanship, duplicative payments and liquidated damages.

31. All parties agree that Welcome approved change orders which increased the contract price in the amount of at least $416,408.32, bringing the total contract price to $6,070,108.32. The parties further agree that Welcome paid at least $5,504,763.67[5] toward the total contract price.

32. Welcome agrees that, absent set-offs, it owes Meybohm $565,344.65 (Exhibit 165).[6] However, Welcome argues that there are some $420,000.00 in set-

---

[5] At trial, Meybohm submitted Revised Exhibit 181 which states that Welcome paid a total of $5,515,165.59.

[6] This amount assumes that Welcome paid out $5,504,763.67. Using the figures submitted by Meybohm, the amount still owed is $554,943.73.

offs, leaving a total due in owing to Meybohm of around $145,000.00.[7]

33. Moreover, Welcome contends that it was under no obligation to pay this sum prior to judgment because (a) Meybohm failed to meet certain conditions precedent under the agreement and (b) Welcome was entitled to withhold funds pending total completion of the work. As a result, Welcome also contends that, despite the amount due in owing, Meybohm is not entitled to interest on this amount under the Agreement.

34. Meybohm argues that Welcome approved an additional $52,210.13 in change order work, and that Meybohm is entitled to interest, costs and attorneys' fees under the agreement and applicable law. Before interest, costs and fees, Meybohm asserted at trial that it was owed $607,152.86 (Revised Exhibit 181).

35. In post-trial submissions, Meybohm acknowledged that Welcome is entitled to set-offs in the amount of $56,466.75. This brings the total claimed to $550,686.11, before any interest or fees (using Meybohm's numbers).

36. Meybohm further asserts that it is entitled to recovery under the South Carolina mechanics' lien statute, S.C. Code § 29-5-10, et seq., and its mandatory award of attorneys' fees and costs to a "prevailing party," id. §§ 29-5-10(a), (b).

37. Meybohm acknowledges that it would only be entitled to collect and enforce a judgment on either the mechanics' lien or the breach of contract cause of action, but not both.

38. Meybohm values the amount of recoverable costs it has expended at

---

[7] As there are minor discrepancies in the parties' figures, the Court here uses general numbers. However, specific dollar amounts will be used in discussing individual claims.

$22,395.93. The value of attorneys' fees expended in pursuit of the mechanics' lien cause of action is calculated by Meybohm to be $222,408.00.[8]

### E. Set-Offs

39. The Plaintiff claims set-offs in the following categories and amounts:

| | |
|---|---|
| •Liquidated damages | $  144,000.00[9] |
| •Repair estimates for incomplete/defective work | 137,365.00[10] |
| •Fire alarm system damages | 2,000.00 |
| •Palm tree replacement | 8,000.00 |
| •HVAC testing and balancing | 1,178.84 |
| •Mechanics' lien claims and expenses | 51,143.00 |
| •Projected lost revenues for room closures | 37,000.00 |
| •Signage allowance | 15,000.00 |
| •Double-billing of extra work orders | 22,063.25 |
| •Consultant's expenses (Connor & Assoc.) | 1,960.00 |

40. As noted earlier, Meybohm has conceded set-offs in the amount of $56,466.75. This consists of $15,000.00 for the signage allowance; $31,868.00 of the claimed mechanics' lien expenses for the release of TruGreen's lien; $5,298.75

---

[8] Meybohm acknowledged in its post-trial submissions that it would not automatically be entitled to attorneys' fees under the breach of contract cause of action.

[9] In its post-trial submissions, Welcome asserts that this amount is $154,000.00. This discrepancy will be specifically discussed below.

[10] In its post-trial submissions, Meybohm asserts that this amount is $147,365.00. However, as the only figure relating to repair damages to be discussed at trial (and specifically listed in Revised Exhibit 165) is $137,365.00, the Court will use this number.

of the claimed mechanics' lien expenses for attorneys' fees and bond premium payments related to the mechanics' lien filed by Sunbelt Rentals; $4,000.00 in repair costs to fix cracks in the pool deck; and $300.00 to repair the sump pump in the basement elevator pit.

41. The remaining items and amounts are still in dispute.

### E.1. Liquidated Damages

#### – E.1.a: Permit Delay

42. Under the agreement, specifically Article 3 of AIA Document A101-1997 (Exhibit 39), the date of commencement for the project was May 1, 2000, with substantial completion to be achieved no later than 360 days from the date of commencement, "subject to adjustments of this Contract Time as provided in the Contract Documents." Further, the parties agreed that time was "of the essence."

43. Meybohm was to "commence construction upon receipt of a site approval and permission to proceed with foundation work and substantially complete the building, ready to transact business (certificate of occupancy) within twelve (12) months and a grace period of two (2) weeks." The parties stipulated to "liquidated damages" in the amount of $2,000.00 per day after the expiration of the grace period, which ended on May 9, 2001.

44. As noted earlier, there is no dispute that a temporary certificate of occupancy was obtained on July 31, 2001, and that the issuance of this certificate constitutes "substantial completion." The parties dispute the amount of extensions granted by Welcome and the number of days which should not count toward the



360 days due to circumstances beyond Meybohm's control.

45. Under Exhibit B to the standard contract (Exhibit 39), the parties added language regarding "permit delay":

> Permit Delay shall be determined as any time that work can not be performed on the site due to required authorized approval, denial or processing as follows: Permit Delay can not be assigned to the start of construction as this is the basis by which this agreement is initiated. Under this Agreement the Contractor is authorized to begin approved site work and pile construction, while the building permit is being processed. Permit Delay can only be applied after the first six (6) weeks of site work, if the Building Permit has not been obtained.

46. Meybohm applied for the building permit on May 1, 2000, and the building permit was issued on July 7, 2000, a period of 68 days.

47. Site work began on May 15, 2000.

48. By letter dated June 12, 2000 – which is six weeks after the start date under the Agreement, Tony Harkins of Meybohm informed Gullion that the site permit had not yet been issued, and, further, that it "had been instructed that we cannot proceed on the pile cap forming and steel placement prior to us receiving the permit. . . . We are proceeding with the drilling of the piles, but can do no work other than that prior to receipt of the permit."

49. This letter also indicates that Harkins "will prepare and send a time delay Change Order to you upon the receipt of the building permit that quantifies the actual delay." No change order was filed specifically outlining the number of days Meybohm was delayed prior to receiving the permit.

### – E.1.b: Change Orders



50. Meybohm submitted a time line in September 2000, estimating the

number of days it would take to complete various portions of the project and generally estimating the interworkings among the various sub-contractors. This time line, which gave a substantial completion date of April 20, 2001, was not itself revised at any later time by Meybohm.

51. There was serious disagreement among the parties as to whether, and how many, time extensions were approved by Welcome. Welcome contends that, aside from the ten-day extension from Change Order #1, Meybohm is entitled to no additional time in which to complete the project. Because the temporary certificate of occupancy was issued on July 31, 2001 and the completion date (plus two-week grace period) expired on May 9, 2001, Welcome asserts entitlement to liquidated damages of $154,000.00, which is $2,000.00 per day the project was late (giving Meybohm credit for the 10-day extension approved by Welcome).

52. Meybohm asserts that Welcome, via Gullion and Walia, agreed to several other extensions of the completion deadline by virtue of their approval of several Change Orders and payment of several Pay Applications.

53. Marvin Hill, estimator for Meybohm, testified that he sought clarification of William Gullion's authority to approve change orders and pay applications for the project. Walia responded that Gullion had such authority.

54. Meybohm submitted a total of 11 change order requests, all of which were eventually approved by Gullion, some with modifications and/or clarifications. Of these change orders, five (5) requested extensions of time.

55. None of the change order requests submitted to and approved by Gullion were returned to Meybohm. Gullion challenged several of the expenditures listed



by Meybohm, and several change orders were revised to reflect a lesser amount of money approved for the changes indicated.

56. Each change order [CO] and extra work order [EWO] was later listed on one or more pay applications submitted by Meybohm. Each of these pay applications bear Gullion's signature, save the last (CO #11Rev). Each of those signed by Gullion were accepted by the lending bank, and Meybohm received payment thereon.

57. There is no dispute that Gullion approved a ten-day extension to accommodate Change Order #1 (Exhibit 70A).

58. Hill testified that he submitted CO #3 to Gullion, indicating that an additional 10 days was needed to complete work on drilling holes to accommodate the communications contractor, as requested by Welcome. This resulted in an additional expenditure of $41,682.00. The Change Order itself indicates as follows:

The Contract Time will be (increased) ~~(decreased) (unchanged)~~ by                    15) days

59. This CO was supported by an EWO, detailing what work needed to be done, by whom, and the price of the subcontract.

60. CO #3 was not signed by Gullion or Walia, but it was listed on Pay Applications approved by Gullion, which the lending bank paid out to Meybohm.

61. Hill also testified that he submitted CO #9Rev to Gullion, indicating that an additional 15 days was needed to complete work on several EWOs totaling $22,569.43. The Change Order itself indicates as follows:

The Contract Time will be ~~(increased) (decreased)~~ (unchanged) by                    15) days

62. This CO was supported by several EWOs, detailing what work needed



to be done, by whom, and the cost necessary to perform the work.

63. CO #9Rev was not signed by Gullion or Walia, but it was listed on Pay Applications approved by Gullion, which the lending bank paid out to Meybohm.

64. The original CO #9, which also listed that the contract time would be "unchanged" by 15 days, was revised at Gullion's request. He objected to the amount of money listed as necessary to complete the work, but made no mention of the number of days listed.

65. Hill testified that he submitted CO #10Rev to Gullion, indicating that an additional 15 days was needed to complete work on several EWOs totaling $32,169.14. The Change Order itself indicates as follows:

> The Contract Time will be (increased) (decreased) (unchanged) by _____ 15) days

66. This CO was supported by several EWOs, detailing what work needed to be done, by whom, and the cost necessary to perform the work.

67. CO #10Rev was not signed by Gullion or Walia, but it subsequently appeared on a Pay Application that Gullion approved, which the lending bank paid out to Meybohm.

68. Hill also testified that he submitted CO #11Rev to Gullion, indicating that an additional 20 days was needed to complete work on several EWOs totaling $82,880.74. The Change Order itself indicates as follows:

> The Contract Time will be (increased) (decreased) (unchanged) by _____ 20) days

69. CO #11Rev was not signed by Gullion or Walia. It appears on the final Pay Application, which was not signed or approved by either Walia or Gullion. Meybohm has not been paid on this Change Order.



17

70. Change Order #11Rev, as submitted by Meybohm (after a two-hour debate with Gullion), is for $82,880.74. Subsequent to the submission of the final pay application, Gullion revised the total approved on CO #11Rev to $41,072.52.

71. The original CO #11, which also indicated that the contract time would be "unchanged" by 20 days, was revised after extensive negotiations with Gullion. The amount submitted for the extra work was originally $114,413.56. Gullion approved a lesser amount (see ¶ 70), but made no mention of the amount of time requested.

72. Each of the COs in question contain a line which reads as follows:

The date of substantial Completion as of the date of this Change Order therefore is _____

No date was filled in by Meybohm on any of the COs.

73. Gullion testified at length that Meybohm was not entitled to any extensions of time because it did not amend the time line it submitted, because it certified that the contract time would be "unchanged," and because it did not provide sufficient "backup" documentation justifying any requested extension of time.

### E.2. Repairs Due to Poor Workmanship

74. Welcome claims a set-off in the amount of $137,365.00, which it asserts is the cost necessary to repair work performed by Meybohm in an unacceptable manner. This alleged faulty workmanship is also the basis for Welcome's breach of contract and breach of warranty causes of action.



75. This estimate is based upon the testimony of Scott Orville McAllister, a general contractor hired by Welcome, who inspected the site in March, 2003, and

18

gave his proposal as to what items needed repairs.[11] McAllister has degrees in engineering, technology and construction management, and has worked for several construction companies, with particular experience in hotel construction. He is a licensed general contractor in several states, including South Carolina.

76. On cross-examination, McAllister disclosed that he had been hired by Dicky Walia to work on at least one other hotel project for Welcome Hotels, and that the construction company for which he had previously worked submitted the highest bids (both original and revised) for the hotel project in question.

77. McAllister acknowledged that his inspection of the premises lasted approximately 90 minutes. He explained that he sent his associate, Chris Bell, to thoroughly inspect the facility and take pictures of any suspected deficiency in construction. McAllister then had another associate, Brian Kirkpatrick, estimate the cost to remove and repair these deficiencies, including man-hours, expenses, materials and a 20% mark-up for profit.

### – E.2.a: Ceramic Tile

78. There was much discussion and debate as to whether the ceramic tile in the hotel's bathrooms was properly installed. McAllister claimed that the tile was not installed correctly, as the tiles at the bottom of the bathroom walls were not placed flush against the tiles on the floor (called "cove tile"). Instead, the wall tile was



---

[11] McAllister's original estimate for repairing the faulty construction was $143,240.00. However, at trial he gave testimony about several items within the hotel that he thought needed repair, but were not listed on his original estimate. McAllister orally revised his estimate to add the following: moisture stains on the lobby ceiling (no price indicated); the lack of expansion joints in the secondary lobby, which caused cracking in the sheetrock ($500.00); lack of cleaning in the third floor dampers (no price indicated); the disorganization of the electrical rooms ($3,250.00); and defective tile installation at the main entry stairs ($1,000.00).

placed on top of the floor tile, creating a small raised lip.

79. Gullion, Welcome's representative on the site, also testified that the bathroom tile was improperly installed. On cross-examination, he acknowledged that this item was never listed on any punch list or complaint letter issued by Welcome.

80. Witnesses from Meybohm, including Bobby Meybohm and Tony Harkins, testified that there were no specific instructions in the plans and drawings requiring that the wall tile be placed flush against the floor tile. They testified that, in the industry, the choice of how to install the tile was left to the discretion of the contractor, absent specific instruction otherwise.

81. Meybohm introduced photographs of tile installation in bathrooms from several other Hilton Garden Inns – located in Charleston, SC, Raleigh, NC, Jacksonville, FL and Rock Hill, SC – which demonstrated that the wall tile was installed atop the floor tile, not flush therewith.

82. McAllister conceded that the Tile Council of America does indicate that placing wall tile on top of floor tile is appropriate under certain circumstances, but that the tile used in the hotel at issue was not "thin-lipped" tile and, therefore, did not fall under the approved circumstances.

83. McAllister estimated that the cost to remove the floor tile in all the bathrooms, replace the tile in the correct manner, and repair the wall damage necessarily incurred by this tile removal was $47,310.00 plus the vast majority of the $3,684.00 estimated as living expenses for the employees who would perform the repairs, plus a 20% "fee" of approximately $9,462.00. Thus, the estimated total for repairing the ceramic tile came to approximately $60,456.00.

*– E.2.b: Vented Fireplace*

84. McAllister testified that the fireplace in the foyer of the hotel should have been a vented model, rather than the ventless type installed by Meybohm.

85. McAllister estimated the cost to remove the ventless fireplace and install a vented fireplace to be $12,000.00.

86. On cross-examination, McAllister acknowledged that he had not seen the plans and specifications issued by Welcome for the project, and that a general contractor had no duty to install equipment and materials in contravention of the plans and specifications.

87. Tony Harkins testified that William Gullion approved drawings specifically providing for a ventless fireplace in the lobby.

*– E.2.c: Cracks in the Pool Deck and Pool Deck Railing*

88. McAllister testified that the concrete decking around the pool, as well as the metal railing, were defective in that the concrete had prematurely cracked and the railings were defective and not properly anchored.

89. In McAllister's original estimate to repair and replace the concrete decking was $15,000.00, plus a 20% fee. However, at trial he asserted that this number should be increased by $4,300.00 to account for an insufficient estimate for demolition, bringing the revised total to $19,300.00

90. McAllister originally estimated the cost to replace the pool deck railing to be $20,000.00, plus a 20% fee. However, he acknowledged at his deposition and at trial that this cost was more reasonably estimated at $5,000.00.

91. McAllister indicated that the metal hinges on the railings around the pool



21

had rusted, but because the owner specified those particular types of hinges the general contractor should not be held responsible for replacing them.

92. Meybohm has acknowledged that the cracking in the pool deck is the responsibility of the general contractor. However, its estimate of the cost to repair the defect is $4,000.00.

93. Gullion estimated the cost to repair the cracking in the pool deck, including removing the old deck and replacing it with "cool deck," to be $4,800.00

94. Bobby Meybohm testified that Gullion approved the replacement of a section of railing which was found to be defective, and that no further claim for the railing was made until litigation was underway.

### – E.2.d: Drains

95. McAllister testified that there were insufficient or defective drains installed throughout the hotel. More specifically, he asserted that the sump well in the basement elevator pit was missing, that there were insufficient drains on the roof, and that secondary drains were needed on the 37 vertical PTAC heating and air units.[12]

96. The estimate for repairing this deficiency was $11,400.00, according to McAllister, plus a 20% mark-up fee. This consists of 37 secondary drains at $200.00 each ($7,400.00 total), roof drains totaling $2,000.00, and the sump well in the elevator pit at $2,000.00.

97. Meybohm asserts that it did install the sump well in the elevator pit, but

---

[12] According to testimony, a PTAC is a typical under-window heating and air unit in a hotel guest room. A vertical PTAC, or VTAC, is a vertically aligned heating and air unit placed in a closet in the hotel's suites.

has acknowledged that it is not operating properly. Its estimate for the cost to repair this pump is $300.00.

98. McAllister acknowledged on cross-examination that the roof drains he reported as necessary do not appear on the original plans and specifications and that Meybohm did not have a duty to install materials or equipment not provided for in the plans.

99. Bobby Meybohm testified that he brought the absence of sufficient roof drains to the owner's attention, but no further action was taken by the owner to remedy the problem.

100. McAllister indicated at trial that, although the secondary drains in the VTAC units were not actually missing (as he had previously indicated), they were not connected properly, or in some cases not connected at all.

101. McAllister's revised estimate to inspect and correct all VTAC and PTAC units in the hotel was $75.00 per unit, for a total of about $7,500.00.

102. McAllister acknowledged that he only inspected two VTAC units and two or three PTAC units on his visit to the site.

103. Kenneth Smith of Smith Brothers Mechanical, the HVAC subcontractor, testified that the secondary drains were properly installed, per the manufacturer's instructions. He indicated that the secondary drain was actually a safety feature; when the primary drain failed to work, condensation would drop into a tray beneath the unit. When this pan became full, the excess was directed to flow out in a "conspicuous" place so that the owner would know that the units were not working properly. In this case the flow was directed to the outside wall of the building.



23

104. Smith opined that the condensation pans were filling up more quickly than normal because the owner failed to provide routine maintenance to unclog the primary drains. He indicated that the owner's maintenance staff was notified that the primary drain hose can become clogged with "no-see-ums," tiny insects prevalent in South Carolina.

105. This opinion was seconded by James Smith, a mechanical engineer (and the father of Kenneth Smith). James Smith also testified that this failure to perform maintenance caused the staining on the outside walls of the hotel that the owner claimed was due to faulty construction.

106. Kenneth Smith also indicated that, with respect to the larger HVAC units over the pavilion (the hotel's main foyer), Gullion refused to permit the condensation to drain out a window. As a result, Smith employed a "floater" system by which the units would cease to work when the secondary drain became full.

*– E.2.e. Exhaust Vents and Vertical PTAC Units*

107. McAllister testified that the exhaust vents in the bathrooms needed to be made of metal, rather than the plastic which was installed. He estimated the cost to replace these vents to be $2,297.00, plus a 20% mark-up fee.

108. McAllister acknowledged that he did not know what type of vents were specified by the plans and specifications provided by the owner, and that the general contractor had no duty to install material or equipment not allotted by the plans.

109. Bobby Meybohm testified that the plans and specifications called for plastic exhaust vents in the guest bathrooms.



24

110. McAllister further testified that the VTAC units in the guest rooms had a metal cap in place which needed to be punched out in order for the units to draw in the requisite amount of outside air. He estimated the cost to perform these punch-outs to be $3,700.00 plus a 20% fee.

111. McAllister noted that he had only inspected two PTAC units, but that the metal caps had not been punched out on either unit.

112. Jay Owen, testifying for Welcome, indicated that the failure to punch out these metal caps resulted in the building being under "negative pressure," which means more air is being exhausted from the building than is being taken in.

113. Owen conceded on cross-examination that the mechanical engineer's original calculation of airflow balance was based on the assumption that all PTAC and VTAC units had to be running "24/7," meaning 24 hours per day, 7 days per week. Owen also acknowledged that if the PTAC units were not running continuously, "then you would have a negative air pressure because over half of the outside air is coming from these 103 PTAC units."

114. James Smith, a mechanical engineer, agreed that, as originally drawn, the building was going to operate under negative pressure. This was largely because, as a "value engineering" step, the owner removed the energy recovery unit from the roof. This unit, Smith testified, would have greatly increased the possibility of the building achieving a neutral, if not positive, pressure.

115. James Smith testified that, of the "five or six" rooms he inspected at the hotel, no PTAC or VTAC unit's fan was running continuously.

116. Owen also recognized that the original airflow balance calculation did



not include any exhaust being vented from the kitchen hood, duct, supply and exhaust fans because the original plans did not provide the specifications for this equipment.

117. Kenneth Smith testified that Gullion asked him to install the kitchen hood and duct work on a "time and materials" basis. Smith noted that the hood was not a "make up" air hood, which would have increased the amount of air being drawn into the hotel.

118. Kenneth Smith testified that he told Gullion of this omission on several occasions, and was assured by Gullion that "the engineer" had made up for this omission in his design plans.

119. Kenneth Smith, the HVAC subcontractor, testified that there was a discrepancy in the ductwork drawings for the pavilion. When he brought it to Gullion's attention, Smith indicated that Gullion re-configured the pavilion ductwork, and directed that this reconfiguration be implemented, without the approval of the mechanical engineer.

120. Kenneth Smith testified that Gullion's modifications omitted any outside air intakes, which would have increased the amount of air drawn into the hotel. Smith brought this fact to Gullion's attention near the end of the project, and, to correct the problem as best he could, Smith installed an air intake box into the louvers beneath a dormer on the roof.

121. Kenneth Smith stated that he believed the metal caps on all the PTAC units were opened prior to the hotel's opening. He further testified that his company had been called back to open PTACs after substantial completion, and that after



26

inspecting all PTACs and VTACs, only three were found to be still closed. Finally, Smith noted that it was the responsibility of the maintenance staff on site to check the units on a regular basis to ensure that none of these caps had inadvertently closed.

### E.3. Fire Alarm System Damages

122. Welcome claims that Meybohm negligently installed the fire alarm system such that it would spontaneously activate, necessitating a number of visits by the local fire department and generating several complaints by hotel guests.

123. Welcome further asserts that there were so many false alarms as a result of this faulty work that the fire department fined the hotel. Welcome also paid the security alarm monitoring company to fix the problem. The total charges came to about $2,000.00. Welcome seeks reimbursement for this expense.

124. Meybohm acknowledged early in the project that it "may be" liable for this amount, but would pursue an investigation to determine if any of the hotel staff were partly to blame. No further conclusions on this issue were expressed in writing.

125. Meybohm denies that it has responsibility for these items because it requested documentation as to the specific amounts paid by Welcome and never received any. It did acknowledge that it had received "some" documentation from the alarm company, Simplex Grunell, and that most of the amounts claimed were within the one-year warranty period outlined in the Agreement.



### E.4. Palm Tree Replacement Cost

126. Welcome, via McAllister and Gullion, argues that it is entitled to withhold $8,000.00 for the replacement of eight palm trees on the property, which it claims were killed within the one-year warranty period outlined in the Agreement, and that it gave notice to Meybohm during this period.

127. There was much debate at trial over the replacement of trees, both palms and otherwise. Meybohm questions whether some of the dead trees were native trees killed during excavation of the building's footings, or otherwise suffering from their close proximity to the building and its underground pipes and conduits. Meybohm also argues that several non-palm trees were killed by drowning because the owner's plans failed to include drains inside the wells in which the trees sat.

128. Meybohm further suggests that the trees died because TruGreen terminated its maintenance agreement with the hotel as a result of not being paid in full by Welcome. Meybohm also claims that it was not notified within the warranty period of any dead palm trees. Meybohm acknowledges it was notified of the death of several non-palms around the property.

129. The owner's punch list of August 21, 2001 indicates that Meybohm should "remove/replace 2 dead trees in tree well." In response to inquiries about the trees, Meybohm responded in November 2001 as follows:

> The trees in question died as a result of the placement of the underground utilities, power, grease trap, and numerous other underground services that enter the building in this location per plans. The trees were not hit during construction, and no work not required by the contract was performed. The trees['] survival is not a responsibility of Meybohm & Associates if the death was caused by normal construction work per plans.



28

130. As late as January 2002, Welcome was still withholding funds for the replacement of palm trees:

> Remove/replace 2 dead trees in tree well, 3 dead trees at the west side of the Pavilion, 1 dead tree at the east side of the Pavilion and 1 dead tree at the pool deck area. 7 total trees ($300/tree for removal plus replace120 inches in overall caliper). These trees were clearly shown on the plans to receive tree protection during construction. The superintendent was repeatedly reminded to maintain this protection, however [sic] it was knocked down at the beginning of construction and never maintained. . . . . <$18,000.00>

131. Photographs submitted by Welcome clearly show several dead palm trees.

132. Tony Harkins of Meybohm testified that Meybohm planted several palms around the property, and took photographs of these trees.

133. Walia testified that, as of trial, Welcome had not replaced any of the dead palm trees.

### E.5. HVAC Testing and Balancing

134. Welcome claims it is entitled to withhold $1,178.84 from the sum owed to Meybohm for "HVAC Testing and Balancing." This claim arises out of the owner's hiring of Dulohery, Weeks & Gagliano, Inc. to inspect the property with regard to the status of the HVAC systems. This firm suggested that Testing, Adjusting and Balancing (TAB) had not been performed on the HVAC system, and that it should be "as an immediate first step" to prevent problems with the system.

135. Welcome hired an independent contractor to perform the TAB, at a cost of $1,178.84.

136. James Smith, a mechanical contractor, and Kenneth Smith, the HVAC subcontractor (and son of James Smith), both testified that there was no requirement in either the Meybohm-Smith Brothers contract or the Welcome-Meybohm contract for Smith Brothers to conduct a TAB. James Smith further noted that it is not uncommon for the owner to separately contract this test.

### E.6. Mechanics' Lien and Expenses

137. Welcome claims entitlement to a set-off in the amount of $13,977.00, the amount of a mechanics' lien filed by Sunbelt Rentals.

138. Meybohm asserts that Welcome never paid any money to Sunbelt for the release of the lien. Rather, it posted a bond to discharge the lien, and Meybohm has agreed to a set-off for the $5,298.75 incurred in obtaining the bond.

139. Meybohm further admits that it will be obligated to pay Sunbelt Rentals on the mechanics' lien out of any recovery it receives in this case, but because Welcome never actually paid any money to Sunbelt, the owner is not entitled to a set-off.

### E.7. Room Closures

140. Welcome asserts it is entitled to withhold funds from Meybohm in the amount of $37,000.00, a sum Walia calculated to be the loss of rental income which will be caused by room closures to repair faulty construction.[13]

---

[13] Welcome presented testimony that it has already lost rental income and related expenses because (1) the hotel had to find other accommodations for guests due to the delay in finishing all the rooms in the hotel and (2) the hotel had to find other accommodations for guests when the faulty fire

141. In making his calculation, Walia assumed, at the time the repairs would be made, that the hotel would be at 65% occupancy, that the average daily room rate would be $85.00, that the net loss per room would be $68.00, that 18 rooms per week would be affected, and that repairs would take 30 days.

142. Meybohm argues that, because there was no "faulty construction" attributable to Meybohm (as outlined above), it cannot be held liable for any income lost in making the necessary repairs.

143. Meybohm also challenges Walia's assumptions as to the amount of occupancy, net loss per room, the number of rooms to be affected, and the number of days needed to perform any repair.

144. Meybohm further notes that the Agreement expressly prohibits the recovery of consequential damages, including loss of revenue.

### E.8. Double-Billing for Change Orders and Extra Work Orders

145. Welcome claims that it is entitled to a set-off in the amount of $22,063.25 on account of Meybohm erroneously billing for "additional work" that was supposed to be part of Meybohm's original contract duties. It further asserts that, under the Agreement, it was entitled to withhold double this amount in anticipation of final payment.

146. Specifically, the Plaintiff argues that EWO #10-R and #11-R, submitted within CO #4, and EWO #44, submitted within CO #8, are for wire and telephone

---

alarm sounded frequently in the middle of the night. This item of lost income is not claimed by Welcome in its post-trial submissions, nor listed in its summary of set-offs.

installation and kitchen duct work, respectively, which were Meybohm's responsibility from the beginning of the project.

147. The Agreement (Exhibit 39), see "Exhibit D: Notes and Qualifications," provides the following language with respect to Meybohm's duties:

> The following Items are Excluded by the General Contractor under this Agreement:
> . . .
> 5. Cable TV Service, System Equipment or Cabling wire. *(All wire installation is included as described in the Drawings and Specifications).*

148. Meybohm employees testified at length that, as an aspect of "value engineering," installation of the communications system was, by oral agreement, taken out of Meybohm's responsibility as general contractor. It was later given, at Welcome's request, to Wimberly Communications, as a sub-contract to Meybohm's general contract.

149. According to Bobby Meybohm, there was no price estimate given in Meybohm's bid because there were no final drawings at the time the Agreement was signed:

> At that point, we didn't have final plans at all. We didn't know what was going to show up in the final plans. We anticipated getting revisions of plans, which we did that weren't finally permitted. The final revisions added a lot of electrical items that were[n't][14] on the previous plans, that the price of the electrical contract went up. There was the agreement to take out of the electrical contractor's -- the owner was given a credit from the electrical contractor for any work dealing with communications at that time. And, then, so it was completely taken out.

---

[14] After contacting the Court Reporter, who listened to her backup audio tape of the hearing, the Court has verified that Meybohm actually said "were." However, from the context of the sentence, it is clear that Meybohm misspoke and actually intended to say "weren't."

> Mr. Gullion was aware it was completely taken out. He said, We're going to handle it outside of the contract completely. We will be responsible for it. So when it goes back in, you -- all that work fell back to the GC and had been taken out of the electrical contractor's contract. . . .

> Q Where in the contract documents is this modification made?

> A It's not made in the contract documents.

> Q Where --

> A I'm saying, when that contract was signed, there were not complete drawings. And your statement they were made several times, there would be modifications? There were modifications and a lot of modifications had give and take.

>> We told you -- you indicated that you were going to be able to eliminate this from the plans; but when we got the plans back, not only was it not eliminated, but a lot of stuff added.

150. Smith Brothers Mechanical Contractors submitted an invoice to Meybohm, which was included in EWO #44, for $9,259.11 for the following work:

> Install range hood provided by others. Provide and install grease ducts, clean outs, hanging materials, fan, etc.
> . . .
> Install dishwasher hood provided by others. Provide and install duct, hanging material, fan, etc.

After the general contractor's markup and some minor adjustments to mileage, the total submitted in EWO #44Rev2 for this work was $9,511.25.

151. Again, Welcome asserts that the kitchen duct work was a job that Meybohm agreed to perform under the Agreement, and that paying for this work via EWO amounts to double payment.



152. Exhibit D: Notes and Qualifications to the Agreement (Exhibit 39) notes that the following item is included in the contractor's scope of work:

12. The purchase, installation, clean up and trash disposal of Kitchen Equipment and Laundry Equipment under separate contract *(All MEP rough ins and ductwork for Hoods are included)*

153. Meybohm counters that, at the time of the Agreement, the plans in effect were silent as to the duct work needed for the kitchen area. As such, Meybohm claims that it could not put out a bid for the duct work until the kitchen equipment contractor's plans were submitted and approved.

154. The architectural drawings showing the mechanical plan of the project note, with respect to the kitchen area, as follows: "KITCHEN HOOD, DUCT, SUPPLY AND EXHAUST FANS PROVIDED AND INSTALLED BY OTHERS," and "DISHWASHER, HOOD, DUCT, SUPPLY AND EXHAUST FANS PROVIDED & INSTALLED BY OTHERS."

155. There was testimony from Bobby Meybohm and Kenneth Smith that the COs relating to the kitchen duct work were specifically negotiated and approved by Gullion for work on a "time-and-materials" basis. This, they assert, indicates that Gullion knew the work was not part of Meybohm's contractual duties.


### E.9. Consulting Fees

156. Welcome claims a set-off the amount of $1,960.00 paid to Connor & Associates for "consulting fees." Connor & Associates billed Welcome directly for its services.

157. Walia claims that Meybohm (specifically Pete Ellis) hired Connor & Associates to assist in preparing the application for a certificate of occupancy, a responsibility left to Meybohm under the agreement.

34

158. Meybohm disputes that it agreed to pay Connor & Associates or offered reimbursement of any type. Meybohm, via Pete Ellis, also argues that Connor & Associates was an "owner's consultant," because Gullion directed him to contact Connor & Associates to speed the process of obtaining the certificate of occupancy.

### E.10. Miscellaneous Set-Offs

159. At trial, Bobby Meybohm acknowledged receiving $1,002.00 from a sub-contractor as an overpayment. He also acknowledged that Welcome would be entitled to a credit for this amount.

### F. Concept Services

160. As part of Meybohm's claim for negligent misrepresentation, it argues that Welcome, specifically Walia, represented to Meybohm that certain money was being withdrawn from the construction loan in order to pay a sub-contractor (Concept Services) to satisfy Meybohm's contract, when in fact the money was used to satisfy Welcome's separate contract with Concept Services.

161. As a result, Concept Services has filed suit against Meybohm in this Court.

162. At trial, Meybohm testified that he was "led to believe" that Welcome was going to take care of the money owed to Concept Services by Meybohm.

163. Welcome asserts that no such representation was made, either to Meybohm or the construction lender.



*G. Prejudgment Interest; Final Payment*

164. Despite the sums it concedes are still due in owing to Meybohm, Welcome claims that Meybohm is not entitled to prejudgment interest on these amounts under the Agreement.

165. Welcome claims that Meybohm did not meet, and as of trial still had not met, all the conditions precedent to receiving "Final Payment" under the Agreement.

166. Welcome contends that Meybohm is not entitled to final payment for several reasons, aside from failure to complete construction in a timely and workmanlike manner: (1) it failed to provide the "final punch list completion and sign off" as required by the Agreement; (2) it did not "submit all lien waiver documents" as required by the Agreement; (3) it did not provide "as-built plans" as required by the Agreement; (4) it did not provide an affidavit that "payrolls, bills for materials and equipment, and other indebtedness connected with the Work has been paid," as required by the General Conditions; and (5) it failed to pay subcontractors as required by the General Conditions."

167. In its post-trial submissions, Meybohm asserts that it is entitled to final payment because "no issues were raised by the parties regarding the timing or amount of progress payments leading up to substantial completion." It further alleges that Welcome's failure to hire a "Project Architect" to administer the contract prevented a certificate of final completion from being issued.

168. Finally, Meybohm asserts that Welcome's acceptance and payment of all prior pay applications, and Gullion's specific approval of the final Change Order #11Rev constituted an acceptance of the work performed, less any set-offs to which

36

Welcome would be entitled. It also argues that the provisions for final payment contemplate that the owner paid all sums to which the contractor was entitled at the time of substantial completion.

169. Bobby Meybohm testified that he did not receive a final punch list to complete, that subsequent to his deposition he was informed that one of his supervisors left "as-built" drawings in the construction trailer on the site, that he submitted an affidavit with the final pay application, and that he could not ensure that his subcontractors were paid because Welcome had not paid him for all the work which had been performed.

170. Meybohm's final pay application [Pay App. #16Rev2] was submitted on November 19, 2001. It requested a total of $253,452.87. It was not signed or approved by either Gullion or Walia.

### H. Time Line of Legal Actions

171. In this dispute, the parties filed several claims and suits against each other.

172. By memo dated January 10, 2002, Gullion acknowledged to Walia that Welcome undisputedly owed Meybohm $190,816.38 under the Agreement. However, Welcome at no time released any monies to satisfy the portion Welcome reasonably believed to be due in owing.

173. Welcome filed suit against Meybohm on January 30, 2002, in Wake County (North Carolina) Superior Court. Meybohm removed the action to federal court, and the action was later transferred to this Court. Welcome filed an amended



37

complaint to which Meybohm responded, asserting several counterclaims against Welcome.

174. On July 1, 2002, Meybohm sent a letter to Welcome seeking the payment of $708,842.06 for "work performed for Welcome Hotels, Inc., as agent for G.S. Partners of Hilton Head, LLC, for construction of the Hilton Garden Inn in Bluffton, South Carolina."

175. Welcome responded, via counsel, with a letter of August 14, 2002, in which it asserted it had made a full and fair investigation of the claim. The letter indicated that Welcome did not believe that it owed Meybohm the asserted sum, but made an offer of judgment in the amount of $275,000.00.

176. The last work to be performed on the project, either by Meybohm or its subcontractors, was July 5, 2002, when Smith Brothers Mechanical finished several items of warranty work.

177. Meybohm filed a mechanics' lien in Beaufort County against the property on July 16, 2002, seeking a total of $708,842.06 in unpaid work. This amount consisted of $638,685.69 in unpaid work, plus interest under the Agreement.

178. On August 19, 2002, Welcome filed a separate action in the Court of Common Pleas for Beaufort County (South Carolina), seeking to dissolve the mechanics' lien and asserting a cause of action for slander of title.

179. Meybohm filed a lis pendens and complaint to enforce the mechanics' lien against Welcome and GS Partners in the Court of Common Pleas for Beaufort County (South Carolina) on October 16, 2002.

180. The state court lawsuits were transferred to this Court for resolution, by consent of the parties and the state court judges presiding over them.

### I. Rendering Findings as Conclusions, and Vice Versa

181. To the extent that this Court has made "findings of fact" which are better expressed as "conclusions of law," and conversely where the Court's "conclusions of law" should be listed as "findings of fact," each category is expressly incorporated into the other.

### III. CONCLUSIONS OF LAW

### A. Controlling Law

1. The parties specifically agreed on a conditional forum for disputes arising out of the project, which required the owner to opt, within 10 days of the dispute's occurrence, to either resolve the dispute through arbitration or to file suit in Wake County, North Carolina.

2. Because Welcome neither submitted the dispute for arbitration nor filed suit in Wake County within the ten-day period, the conditional provision became moot and the parties were free to bring suit in any court having original jurisdiction over the action.

3. As the construction site in question is located in Beaufort County, South Carolina, this Court has jurisdiction over the dispute.

4. Accordingly, the law of South Carolina governs the issues in this action.



*B. Comment on the Parties' Conduct With Respect to the Agreement*

5. The Court finds it difficult to strictly construe particular provisions of the parties' Agreement where the parties themselves paid them little heed. The Court recognizes that it may be standard in the industry, as noted by William Walker (Meybohm's architect), for the parties to a construction contract not to hold to the letter of its provisions. However, for one party to assert entitlement to payment or to withhold payment based upon to other's disregard for terms in the Agreement is much akin to the pot calling the kettle black.

6. Neither party fully complied with all terms of the Agreement. On occasion both parties tacitly formed a course of conduct to which they must be bound, although this course is not totally in line with the provisions to which they agreed. And on other occasions, one party totally failed to abide by the Agreement to the other party's detriment. As such, the Court will reasonably apply the provisions of the Agreement to the parties' conduct.

*C. Set-Offs Claimed by Welcome*

7. As noted previously, Welcome claims set-offs totaling approximately $420,000.00. Also noted previously was Meybohm's acknowledgment that Welcome is entitled to set-offs in the amount of $56,466.75.

*C.1. Liquidated Damages*

8. Tony Harkins' letter of June 12, 2000 is sufficient notice under the Agreement to trigger permit delay. Welcome's argument that Meybohm should receive no credit for permit delay because it broke its promise to provide specific



documentation is unavailing. The Agreement does not require Meybohm to submit a report specifying what processes were delayed by the failure to obtain the permit and by how much.

9. The Court recognizes that the Agreement generally requires Meybohm to submit monthly status reports to keep the owner well-advised as to the status of the project. This "breach," however, is not substantial, especially given the constant daily contact between Gullion and Meybohm's construction supervisors.

10. The testimony at trial indicates clearly that the logistical orchestration of various sub-contractors' and inspectors' schedules, some of which are dependent upon each other, is a moving target, subject to change on an hour-by-hour basis. Meybohm submitted several monthly reports, up until the last few months of the project. It also kept in constant contact with the owner's representative, be it by letter, phone or in person. To argue that Meybohm is not entitled to any extensions of time because it failed to file a few monthly reports is an inequitable position, especially given the number of additions and changes requested by the owner throughout the project.

11. William Gullion's assertion that Meybohm is not entitled to additional days requested in change orders because of a ministerial error is not appropriate. It is clear from the context of the change orders that a certain number of additional days were requested for the extra work submitted. Disclaiming the extensions because the word "increased" was struck through and the word "unchanged" was not is an inequitable position which this Court will not support.

12. Gullion's failure to challenge the amount of time requested in the various



41

change orders, especially when he challenged the amount of money claimed on several occasions, is a tacit acceptance of the change orders. This is particularly true given the fact that Gullion approved several pay applications which included these change orders.

13. Gullion's continuous assertion that there was insufficient "back up" to justify the amount of extra days requested is not supported by the evidence. The COs and accompanying EWOs in evidence detail, even to a construction novice, the work that needed to be done, by whom, and how much it would cost. Gullion's approval, on some occasions after vigorous debate, of tens of thousands of dollars in additional work indicates that the EWOs submitted to justify the expenditures were sufficient. To later disapprove the amount of days it took to perform this work because there was no "back up" is simply wrong.

14. In view of these conclusions, therefore, Meybohm is entitled to a total of 105 days' extension in the contract time. This consists of 25 days for permit delay (June 12, 2000 - July 7, 2000) and 80 days for extensions requested in change orders.

15. Accordingly, under the Agreement liquidated damages did not begin to apply until 105 days after May 9, 2001, or August 22, 2001.

16. As the date of substantial completion is undisputedly shown to be July 31, 2001, Meybohm finished some three weeks ahead of schedule.

17. Welcome is thus entitled to no set-off for liquidated damages under the Agreement.



### C.2. Construction Defects

18. Scott McAllister's testimony is not fully acceptable to the Court. His inspection of the property (even considering the inspections performed by his employees) was cursory at best. His explanations of what was done incorrectly and why, when compared to testimony given by Meybohm's witnesses, are less persuasive.

19. McAllister's estimates, which he later altered significantly, were shown to be unreasonable, and the problems and causes he identified were fully rebutted by other witnesses.

#### – C.2.a: Ceramic Tile

20. Welcome has failed to demonstrate its entitlement to a set-off for the bathroom tile issue. There is no indication that the plans and specifications require the tile to be flush. Welcome simply cannot surmount Meybohm's evidence of the standard in the industry (contractor's choice) and photos of five other Hilton Garden Inns with the same installation.

#### – C.2.b: Vented Fireplace

21. Welcome is not entitled to a set-off for installing a vented fireplace because Gullion specifically approved drawings calling for a ventless fireplace.

#### – C.2.c: Cracks in the Pool Deck and Pool Deck Railing



22. McAllister's estimate of $19,300.00 for the demolition and replacement of the pool deck is simply not credible. Welcome, after estimating the cost for replacing the entire deck to be in the neighborhood of $30,000.00 (Exhibit 123), later indicated that only the cracked areas needed to be replaced, at an estimated

cost of $4,800.00.

23. Meybohm's estimated repair cost of $4,000.00 (submitted in its post-trial memorandum) is most credible in this instance. Moreover, the Court accepts Meybohm's assertion that Gullion approved the replacement of a section of the pool railing found to be defective, which has already been performed.

24. Accordingly, Welcome is not entitled to an additional set-off for this item, over and above that to which Meybohm has agreed.

### – C.2.d: Drains

25. McAllister was proven incorrect with respect to all three claims for set-offs involving drains. First, he testified that the sump well in the basement elevator pit was not installed, even though he had not personally inspected it. Meybohm asserts that it was installed but that it is not working properly. Welcome is entitled to a set-off of $300.00 (which is Meybohm's estimate to repair it).

26. McAllister acknowledged that, upon a review of the plans, Meybohm could not be held responsible for failing to install roof drains because the specifications did not require any. Welcome is not entitled to a set-off for this item.

27. McAllister originally believed that the secondary drains in the VTACs and PTACs were not installed. He then admitted at trial that they were in fact installed, but they were installed improperly. Based on the testimony of Kenneth Smith and James Smith, it is clear that the drains were properly installed and that any "defect" alleged to be present is actually the result of improper maintenance. Welcome is not entitled to a set-off on this item.



### – C.2.e: Exhaust Vents and Vertical PTAC Units

28. McAllister noted that the plastic bathroom exhaust vents he indicated were a "defect" were actually installed according to the plans and specifications. Welcome is not entitled to a set-off for this item.

29. As for Meybohm's alleged failure to "punch out" the metal caps on the VTACs and/or PTACs, the Court accepts Kenneth Smith's testimony that all but a few of these caps were indeed removed, and that he was called back to open some inadvertently missed. McAllister testified that he only saw four or five of the units in his 90-minute inspection. Welcome is not entitled to a set-off for this item.

### C.3. Fire Alarm System

30. There is no question that Welcome paid monies to the local fire department and alarm company due to the faulty nature of the fire alarm. Meybohm acknowledged early in the project that it "may be" liable for these amounts.

31. Meybohm's failure to follow through with its investigation, or to provide any reasonable evidence to rebut the owner's assertions that it (Meybohm) was the cause for the fault alarm, leaves the evidence virtually unrebutted. Welcome is entitled to a set-off in the amount of $2,000.00.



### C.4. Palm Tree Replacement

32. The evidence on the issue of which trees died, how they died and who is responsible for their death is, at best, murky. It is clear that some non-palms died as the result of Welcome's failure to install drains in the tree wells. It also seems

plain that some native trees died as the result of the construction process.

33. Based on the evidence, the Court concludes that Meybohm was responsible for maintaining the palm trees, and as such Welcome is entitled to a set-off in the amount of $8,000.00.

### C.5. HVAC Testing and Balancing

34. It is clear from the testimony of Kenneth Smith and James Smith that performing a testing, adjusting and balancing (TAB) on the HVAC system was not required under either the Meybohm-Smith Brothers contract or the Welcome-Meybohm contract.

35. As such, Welcome is not entitled to a set-off for this item.

### C.6. Mechanics' Lien and Expenses

36. Meybohm has accepted responsibility for paying $31,868.00 for the release of TruGreen's lien. Meybohm has also acknowledged that it is responsible for paying $5,298.75 for attorneys' fees and a bond premium paid to release the mechanics' lien of Sunbelt Rentals.



37. Welcome seeks a set-off for an additional $13,977.00, the actual value of Sunbelt's lien. However, because Welcome never actually paid this money to Sunbelt (the bond was filed to protect Sunbelt's interest), it cannot recover this sum. Meybohm acknowledges that it must pay this amount from any recovery it receives in this case.

38. Accordingly, Welcome is not entitled to a set-off over and above that conceded by Meybohm.

### C.7. Room Closures

39. The Court rejects Walia's off-hand, informal estimate as to how much revenue the hotel would lose by repairing Meybohm's alleged faulty construction. It is not based on any real statistical averages, and assumes facts that have not objectively proven to be true.

40. In any event, the Agreement specifically disclaims any recovery of consequential damages, of which lost revenue is a part. Further, the Court finds that the extent of Meybohm's faulty construction is not as great as Welcome has alleged, so the amount of room closures attributable to Meybohm would be significantly reduced, if such damages were reasonable.

41. Accordingly, Welcome is not entitled to a set-off for this item.

### C.8. Double Billing

42. The Court cannot give credence to the testimony that a general contractor may properly estimate those portions of a project for which there are no plans or specifications.

43. Meybohm employees testified unambiguously that, although the Agreement provided that wire installation and MEP duct work were to be performed by the general contractor, there was no way to estimate and submit a bid for this work due to the lack of plans and specifications.



44. Moreover, there was ample testimony that the wire installation was specifically removed from Meybohm's responsibilities by Welcome, as an exercise in "value engineering," only to be put back in later by Welcome. Meybohm is entitled to be paid for this work.

45. Additionally, both Bobby Meybohm and Kenneth Smith testified that Gullion approved Smith Brothers Mechanical to perform the kitchen duct work on a "time and materials" basis, indicating that it was work outside the project's scope.

46. Welcome is not entitled to a set-off for this item.

### C.9. Consulting Fees

47. There is conflicting testimony as to which party requested Connor & Associates to get involved in the project. Walia asserts that Pete Ellis requested Connor on his own. Pete Ellis asserts that Gullion directed him to contact Connor. Connor billed Welcome directly for its services, without submitting an invoice to Meybohm.

48. Based on the evidence, the Court finds Pete Ellis' testimony more credible.

49. Accordingly, Welcome is not entitled to a set-off for this item.

### C.10. Miscellaneous Set-Offs

50. Meybohm acknowledged that Welcome is entitled to a credit of $1,002.00 which was the result of an overpayment to a sub-contractor.

48

### *C.11. Set-Off Totals*

51. Based on the foregoing, the Court finds that Welcome is entitled to the following set-offs:

a. Meybohm's concession that Welcome is entitled to $56,466.75, which consists of the following: $15,000.00 for the signage allowance; $31,868.00 of the claimed mechanics' lien expenses for the release of TruGreen's lien; $5,298.75 of the claimed mechanics' lien expenses for attorneys' fees and bond premium payments related to the mechanics' lien filed by Sunbelt Rentals; $4,000.00 in repair costs to fix cracks in the pool deck; and $300.00 to repair the sump pump in the basement elevator pit;

b. An additional $2,000.00 for damages incurred as a result of the faulty fire alarm;

c. A total of $8,000.00 for replacement of palm trees; and

d. The sum of $1,002.00 for overpayment to a sub-contractor.

52. This brings the total amount of set-offs to which Welcome is entitled to $67,468.75.

### *D. Welcome's Causes of Action*

53. Welcome has asserted the following claims against Meybohm: (1) breach of contract; (2) breach of express warranties; and (3) breach of implied warranties. It also filed a claim for slander of title and to dissolve the mechanics' lien filed by Meybohm.

54. Based on this Court's previous findings and conclusions, the Court

acknowledges that Meybohm did not perform every duty and obligation called for under the Agreement.

55. However, based on the finding that neither party fully complied with the Agreement, it is difficult to find by a preponderance of the evidence that Meybohm breached the contract to Welcome's detriment.

56. At the most, the Court can only conclude that Meybohm substantially complied with the Agreement, but failed to perform fully in a workmanlike manner.

57. Given the warranty provisions of the Agreement, which provide an opportunity for Welcome to notify Meybohm of construction issues and to have those items repaired or replaced at no cost, the only "damages" suffered by Welcome are those construction items which have not yet been fully satisfied.

58. Thus, to the extent Welcome is entitled to a recovery under its causes of action, this recovery is limited to set-offs in the amount of $67,468.75 – the sum estimated by the Court, or conceded by Meybohm, as necessary to take care of the faulty construction.

59. For the reasons stated below, the Court concludes that Welcome is not entitled to relief under its slander of title and dissolution of mechanics' lien causes of action.

*E. Meybohm's Causes of Action*

*E.1: Breach of Contract*

60. The contract price under the Agreement is $5,300,000.00. Pursuant to the Memorandum of Understanding, Welcome agreed to pay Meybohm an

50

additional $353,700.00. The amount of change orders which were approved and paid is $385,737.71. The total amount of money owed to Meybohm under the parties' mutual agreements is thus $6,039,437.71.

61. Because Gullion approved the CO #11Rev after extensive consultation with Meybohm, the Court finds his later attempt to revise this number to be ineffective; thus, Meybohm is entitled to an additional amount of $82,880.74 for this Change Order.

62. The total to which Meybohm is entitled, before set-offs, is therefore $6,122,318.45.

63. Meybohm acknowledges that it has been paid a total of $5,515,165.59. This brings the amount owed to Meybohm, before set-offs, to $607,152.86.

64. Under this cause of action, Meybohm is entitled to the balance of the money owed under the Agreement, less set-offs.

65. After Welcome's set-offs in the amount of $67,468.75, Meybohm is entitled to a recovery of $539,684.11 under the Agreement, as modified by the parties (without consideration of prejudgment interest).


### E.2: Negligent Misrepresentation and Breach of Contract Accompanied by a Fraudulent Act

66. From the testimony, it is clear only that each party used the Agreement and its provisions in the light most favorable to protect its individual interests as the project progressed.

67. Though some of Welcome's actions and legal positions were

unreasonable, the Court does not find that there was fraudulent intent.

68. Further, the Court is not satisfied by a preponderance of the evidence that Welcome, with fraudulent intent, asserted that it would pay Concept Services for the work performed under Meybohm's subcontract.

69. Accordingly, Meybohm is not entitled to additional recoveries under these causes of action.

### E.3: South Carolina Improvements to Real Estate Act

70. The South Carolina Improvements to Real Estate Act [SCIREA], specifically S.C. Code § 27-1-15, provides as follows:

> Whenever a contractor, laborer, design professional, or materials supplier has expended labor, services, or materials under contract for the improvement of real property, and where due and just demand has been made by certified or registered mail for payment for the labor, services, or materials under the terms of any regulation, undertaking, or statute, it is the duty of the person upon whom the claim is made to make a reasonable and fair investigation of the merits of the claim and to pay it, or whatever portion of it is determined as valid, within forty-five days from the date of mailing the demand. If the person fails to make a fair investigation or otherwise unreasonably refuses to pay the claim or proper portion, he is liable for reasonable attorney's fees and interest at the judgment rate from the date of the demand.

71. It is undisputed that, as of January 10, 2002, Welcome understood that, even with all the set-offs to which it claimed entitlement, at least $190,816.38 was still due in owing to Meybohm.

72. The offer of judgment on August 14, 2002, did not satisfy the provisions of S.C. Code § 27-1-15.

73. The evidence of an "industry standard" permitting a construction owner

to withhold double the amount of claimed set-offs is unavailing to this cause of action. The SCIREA does not provide for an exception to the mandatory payment requirement based on an unwritten "industry standard."

74. Because Welcome failed to acknowledge the amounts undisputedly owed to Meybohm, Meybohm is entitled to recovery under SCIREA. As such, Meybohm may recover its reasonable attorneys' fees and interest at the judgment rate from January 10, 2002.[15]

### E.4: Mechanics' Lien

75. Under South Carolina law, in order for a mechanics' lien to be perfected, the party imposing the lien must serve the property owner with a "statement of a just and true account of the amount due him" within 90 days "after he ceases to labor on or furnish labor or materials for such building or structure." S.C. Code § 29-5-90.

76. Welcome contends that Meybohm's lien must be dissolved because its statement of account, filed on July 16, 2002, was not within the requisite period after Meybohm ceased working on the project.

77. The statute also requires that the party imposing the lien file a lis pendens and suit for enforcement of the lien "within six months after the person desiring to avail himself thereof ceases to labor on or furnish labor or material for such building or structures." S.C. Code § 29-5-120.

78. It is undisputed that Smith Brothers Mechanical was at the hotel on July

---

[15] Because Meybohm's recovery under either the breach of contract and/or mechanics' lien causes of action is significantly greater, the Court does not calculate the SCIREA recovery herein. This amount would be based on the sum of $190,816.38, beginning on January 10, 2002.

2 and July 5, 2002, to perform warranty work.

79. Warranty work by subcontractors, necessary to complete performance under the contract, has been held to be a furnishing of "labor and materials" under the mechanics' lien statute. See Crystal Pools, Inc. v. Old Claussen's Bakery, 303 S.C. 68, 399 S.E.2d 5 (Ct. App. 1990).

80. Because the warranty work performed by Smith Brothers Mechanical was necessary to complete performance under the parties' Agreement, and because such work was performed within 90 days of Meybohm's accounting statement (in the form of an affidavit to the lien), Meybohm properly perfected its lien.

81. Because Meybohm filed its state court action to enforce the lien on October 16, 2002, which is within six months of Smith Brothers' last warranty work, Meybohm properly perfected its lien.

82. The inaccuracy of the filer's accounting statement is not grounds for defeating or otherwise invalidating the lien, "unless it appear that the person filing the certificate has wilfully and knowingly claimed more than is his due." S.C. Code § 29-5-100.

83. The Court does not find that Meybohm "wilfully and knowingly claimed more than is [its] due." Id. In fact, its original demand, consisting of $638,685.69 in unpaid principal plus interest, is remarkably close to the amount (absent set-offs) to which this Court has found Meybohm entitled. As such, Meybohm is entitled to enforce its lien against the property to the extent it has proven entitlement.

84. As previously noted in its prior findings and conclusions, this Court holds that Meybohm has proven entitlement to recover $539,684.11 under its breach of

contract cause of action (before consideration of prejudgment interest). This Court further holds that Meybohm is also entitled to this amount of recovery under the mechanics' lien statute.

85. The mechanics' lien statute provides for the award to a "prevailing party" of "costs which may arise in enforcing or defending against the lien . . ., including a reasonable attorney's fee." S.C. Code § 29-5-10(a).

86. The "prevailing party" for purposes of this statute is based upon the "offers of settlement," if any, filed by the parties. Id. § 29-5-10(b). The offer of settlement "shall state that it is made under this section [of the mechanics' lien statute] and specify the amount, exclusive of interest and costs, which the party serving the offer is willing to agree constitutes a settlement of the lien." Id. If there are no offers of settlement made, the party seeking the lien is presumed to have made an offer to the extent of its prayer for relief, id., and the party opposing the lien is presumed to have made an offer of "zero," id.

87. "For purposes of the award of attorney's fees, the determination of the prevailing party is based on one verdict in the action." Id. "One verdict assumes some entitlement to the mechanics' lien and he consideration of compulsory counterclaims. The party whose offer is closer to the verdict reached is considered the prevailing party in the action." Id.

88. In this action, Meybohm did not make a specific offer of settlement under the statute. Thus, its offer is presumed to be its prayer for relief, which was $708,842.06, exclusive of interest and costs.

89. Welcome's "offer of judgment" in the amount of $275,000.00 was made

in connection with the SCIREA, not the mechanics' lien statute. There is no evidence that Welcome proposed an offer of settlement within the requirements of the mechanics' lien statute.

90. As such, for purposes of determining the prevailing party under the mechanics' lien statute, Welcome's offer is presumed to be $0.00.

91. In its previous findings and conclusions, the Court has determined that Meybohm is entitled to a recovery, exclusive of interest and costs, in the amount of $539,684.11 (after giving credit to off-sets proven by Welcome).

92. This amount is nearer to Meybohm's demand of $708,842.06 than it is to Welcome's offer of $0.00. Accordingly, Meybohm is the "prevailing party" under the mechanics' lien statute, and Meybohm is therefore entitled to recover its costs incurred in enforcing the lien, "including a reasonable attorney's fee." Id. § 29-5-10(a).[16]

### E.5: Quantum Meruit

93. A cause of action for quantum meruit is a request for equitable relief. Indeed, "it has been established firmly that a measure of damages in quantum meruit is available only in situations in which there is an implied contract but no express contract exists." 13 S.C. Juris. Implied Contracts § 7 (1992 & Supp. 2004) (citing cases). "When there is an express contract, the proper remedy is the contract price and a quantum meruit recovery is not permitted." Id.

---

[16]  Even if the Court were to consider Welcome's offer of $275,000.00 as an "offer of settlement," Meybohm would still be the "prevailing party," because the $539,684.11 awarded by the Court is closer to Meybohm's demand than it is to $275,000.00.

94. In this case, Meybohm has established recovery under a number of express causes of action, including the contract with Welcome as well as the mechanics' lien statute. As such, Meybohm is not permitted to also recover under the theory of quantum meruit.

*F. Prejudgment Interest*

95. Because this dispute has raged for so long, the amount of potential prejudgment interest recoverable under the parties' Agreement is significant. In the Agreement is found the following provision:

> Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
>
> 1.5% per month

96. Welcome disputes Meybohm's entitlement to prejudgment interest, largely because of its asserted right to withhold "final payment" under the Agreement until all preconditions had been met.

97. The problem in this case is that neither party fully complied with every condition of the Agreement, particularly with respect to final payment, making it difficult to hold one party's failures against it to the detriment of the other.

98. Meybohm does not appear to have actually submitted the required affidavit of payrolls, materials, etc. required for final payment, nor all of the lien waiver documents, as required under the Agreement.

99. Moreover, not all the items from the last "punch list" issued by Welcome have been fully resolved between the parties.

100. By the same token, Welcome has for months withheld a large sum of money which should have been paid to Meybohm upon substantial completion under the Agreement. The Agreement generally provides that all monies are to be paid over to the contractor at the time of substantial completion, with the exception of those amounts necessary for completion of correction work or unsettled claims.

101. By its own admission, Welcome -- on the advice of Gullion -- withheld funds (at least $190,000.00) it <u>knew</u> to be due in owing to Meybohm, purportedly in an attempt to encourage Meybohm to properly finish the project. When the evidence of Welcome's purported set-offs is examined, this figure becomes $539,684.11.

102. The Court recognizes that Meybohm agreed to Walia's designation of Gullion as "project manager," in place of a "project architect." However, the fact is that Gullion, who in his role as project manager was responsible for final sign-offs and approvals of work, was the driving force behind much of the dispute with Meybohm, especially as the project approached substantial completion.

103. Welcome's breach of the parties' Agreement – specifically the withholding of a large sum which was <u>admittedly due</u> – essentially tied Meybohm's hands and forced it into this litigation, and this Court certainly disapproves of such conduct by Welcome.

104. "The law allows prejudgment interest on obligations to pay money from the time when, either by agreement of the parties or operation of law, the payment is demandable and if the sum is certain or capable of being reduced to certainty." <u>Smith-Hunter Const. Co. v. Hopson</u>, 616 S.E.2d 419, 421 (S.C. 2005) (citation omitted). "The fact that the sum due is disputed does not render the claim

unliquidated for the purposes of an award of prejudgment interest." Id. "The proper test for determining whether prejudgment interest may be awarded is whether or not the measure of recovery, not necessarily the amount of damages, is fixed by conditions existing at the time the claim arose." Id.[17]

105. "The right of a party to prejudgment interest is not affected by rights of discount or setoff claimed by the opposing party." S. Welding Works, Inc. v. K & S Constr. Co., 286 S.C. 158, 332 S.E.2d 102, 164 (Ct. App. 1985) (citing Robert E. Lee & Co. v. Comm'n of Pub. Works, 248 S.C. 92, 149 S.E.2d 59 (1966)). "It is the character of the claim and not of the defense to it that determines whether prejudgment interest is allowable." Id. (citations omitted).

106. The Court recognizes that there were indeed several construction elements which have proven to be the result of poor workmanship on Meybohm's part – or that of its subcontractors. However, the evidence clearly demonstrates that the majority of claims for which Welcome has withheld funds are the result of Welcome's own failings, be they from poor plans and specifications, from poor maintenance and upkeep, or some other failure on its part.

107. In this case, "[t]he measure of recovery was fixed by conditions existing at the time the claim arose." Id. Meybohm made application for a definite sum in the final pay application, which Welcome refused to honor;[18] thus, the Court concludes

---

[17] See also id. at 421 ("The mere fact that [Owner] disagreed with Builder regarding the amounts, which were stated in the invoices, representing completed work did not preclude an award of prejudgment interest.").

[18] Again, the fact that there may be an "industry standard" which approves of an owner withholding "retainage" from final payment is irrelevant to whether the "measure of recovery" was fixed by conditions existing at the time the claim arose." See Hopson, 616 S.E.2d at 421.

that Meybohm is entitled to prejudgment interest, at the contract rate of 1.5% per month, on the sums it was owed as of November 19, 2001.[19]

108. Under normal circumstances, prejudgment interest would calculate from December 19, 2001 until the date of this Judgment, which by the Court's reckoning comes to $530,793.47 through the September 19, 2005, calculation date.

109. In the present action, however, due to various circumstances, it took an inordinately long time for the parties to submit post-trial briefs and for the Court to issue this Judgment. As such, the Court concludes in its discretion that it would be inequitable to charge Welcome for the full amount of prejudgment interest.

110. This Court normally requires parties in a bench trial to submit post-trial memoranda within 120 days after the receipt of the transcript. Likewise, the Court usually places upon itself a deadline of 120 additional days thereafter in which to issue the judgment. Due to the unusual circumstances of this case, in particular the sheer enormity of the record, these deadlines were neither imposed nor met.

111. In its discretion, therefore, the Court finds it equitable to charge prejudgment interest only for the period it would have normally taken for a judgment to issue – eight months from the receipt of the transcript.

112. The record reflects that the final volume of the transcript in this case was filed on December 8, 2003. Eight months after this date is August 8, 2004.

---

[19] The Court takes this opportunity to distinguish the holding in the K & S Construction decision. There, the Court of Appeals of South Carolina affirmed the circuit judge's refusal to add prejudgment interest. 332 S.E.2d at 106. However, the cause of action at issue in K & S was one for an account stated, which requires that "the parties either expressly or impliedly agreed that it is a true statement and is due to be paid then or at some other specified time." Id. (citation omitted). Here, by contrast, there was no cause of action for an account stated, and there is ample evidence that, aside from the amount of set-offs due, the amount due under the Agreement was not reasonably disputed.

113. Accordingly, the Court concludes that Meybohm is entitled to an award of prejudgment interest on the principal amount of $539,684.11, from a period beginning December 19, 2001 through August 8, 2004. By the Court's calculations, (through the July 19, 2004, calculation date), this amount comes to $329,382.34 in prejudgment interest.[20]

## G. Costs and Attorneys' Fees

114. Meybohm has established its entitlement to attorneys' fees under the mechanics' lien statute and the SCIREA. Meybohm has also established its entitlement to costs under the mechanics' lien statute, the SCIREA and the breach of contract cause of action.

115. Meybohm submitted its affidavit of costs and attorneys' fees to counsel for Welcome, who has interposed several objections:

a. That several of the costs claimed by Meybohm are not recoverable costs under Federal Rule of Civil Procedure 54(d) and 28 U.S.C. § 1920;



b. That the attorneys' fees claimed by Meybohm are for work performed on claims other than prosecuting the mechanics' lien action; and

c. That billing for paralegal services is not itemized, making it difficult to determine how and whether these charges are proper.

116. Meybohm responded with an amended affidavit attaching specific, itemized breakdowns of attorney time, paralegal time, and costs associated with this

---

[20] Of course, post-judgment interest will accrue as normal from the date of this Judgment.

action. The response also concedes that some costs and fees charged in the initial affidavit are unrecoverable.

### G.1. Costs

117. Meybohm has removed from its request for costs certain categories such as meals, postage, computer research, and costs associated with other cases, totaling $1,604.52. Still in dispute are other categories, including non-postal delivery charges, mileage/travel reimbursements, mediation fees and witness/deposition fees.

118. Federal Rule of Civil Procedure 54(d) authorizes the recovery of costs to a prevailing party. Title 28 U.S.C. § 1920(a) provides for recovery of the following costs:

(1) Fees of the clerk and marshal;

(2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and copies of papers necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

The courts are directed to use their discretion in awarding costs outside these delineated categories. See generally, Wright, Miller & Kane, *Federal Practice & Procedure*, Civil 3d § 2668 ("Other than when the matter is controlled by a federal statute or rule, Rule 54(d) vests the court with a sound discretion, which extends to

all civil actions and embodies a practice long recognized in equity.").

119. To the extent Welcome disputes the recoverability of express delivery service fees, the Court agrees. Meybohm specifically conceded that it was not entitled to recover its costs for postage, and offers no compelling reason why express delivery service fees should not be similarly treated.

120. The Court has identified $242.19 listed by Meybohm for express delivery service fees. This amount is not recoverable.

121. To the extent Welcome disputes Meybohm's request for witness and deposition fees, the Court disagrees. Welcome argues that many of the depositions Meybohm took were not "introduced at trial." However, the record reflects that the vast majority of the depositions taken were actually used at trial, either as the witness' entire testimony or as a tool to impeach the witness' credibility.

122. This cost category is specifically allowed under § 1920, and Welcome points to no specific deposition cost or witness fee which was completely unnecessary to Meybohm's preparation for trial. See LaVay Corp. v. Dominion Fed. Sav. & Loan Ass'n, 830 F.2d 522, 528 (4th Cir. 1987) ("A district court should award costs when the taking of a deposition is reasonably necessary at the time of its taking.") (citation omitted). Welcome's argument in this regard is rejected.

123. Welcome briefly cites a 1983 decision from this District, Wolfe v. Wolfe, 570 F. Supp. 826 (D.S.C. 1983), and generally notes that the court there "denied reimbursement for travel expenses." Welcome does not argue why the itemized costs for mileage should be excluded in this case, but it can be assumed that it puts forth Wolfe's denial of any expenses incurred by the prevailing party's attorneys.

124. Though there are few cases precisely on point, most courts have denied as costs the expenses incurred by a prevailing party's attorneys to attend depositions. See Harkins v. Riverboat Servs., Inc., 286 F. Supp. 2d 976, 983 (N.D. Ill. 2003) (attorney travel expenses not recoverable as costs because they are not listed in § 1920); generally 10 Wright, Miller & Kane, *Federal Practice & Procedure*, Civil 3d § 2676 (collecting cases).

125. The Court, in its discretion, will not permit recovery of attorney travel expenses incurred in attending depositions. Upon review of Meybohm's supplemental affidavit, some $671.40 are claimed for mileage reimbursements for the attorneys. This amount is disallowed.

126. Finally, Welcome objects to the inclusion of mediation fees and expenses. Meybohm asserts that these expenses should be considered recoverable costs because mediation in this District is mandatory.

127. This Court can find little case authority expressing an opinion on this issue, but the authority which does exist tends to decline awarding mediator's fees as costs. See Brisco-Wade v. Carnahan, 297 F.3d 781, 782 (8th Cir. 2002) (§ 1983 case); State of Kan. ex rel. Stephan v. Deffenbaugh Indus., 154 F.R.D. 269, 270 (D. Kan. 1994); AM Props. v. Town of Chapel Hill, 202 F. Supp. 2d 451, 456 (M.D.N.C. 2002) (collecting cases). The Court agrees with these authorities.

128. Accordingly, Meybohm is not entitled to recover as costs the sum of $695.04 paid to the mediator in this case.

129. With these deductions, under Meybohm's supplemental affidavit, the Court concludes that $3,213.15 should be disallowed as costs. The remaining

64

$19,851.41, however, is awarded by the Court as costs.

### G.2. Attorneys' Fees; Paralegal Fees

130. In general, the Court has considerable discretion in determining the amount of attorneys' fees to be awarded. E.g., Colonial Williamsburg Found. v. Kittinger Co., 38 F.3d 133, 138 (4th Cir. 1994).

> In awarding attorneys' fees, the district court should first focus on the time and labor expended and the customary fees for like work. See Anderson v. Morris, 658 F.2d 246, 249 (4th Cir. 1981) (applying twelve factors enunciated in Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir. 1974) and adopted by Fourth Circuit in Barber v. Kimbrell's Inc., 577 F.2d 216, 226 n.28 (4th Cir.), cert. denied, 439 U.S. 934 (1978)). After determining the initial fee, the district court should consider whether to adjust the fee on the basis of other factors, briefly explaining any adjustment. See Anderson, 658 F.2d at 249.

Colonial Williamsburg, 38 F.3d at 138 (parallel citations omitted).[21]

131. Meybohm's initial affidavit of attorneys' fees claims that it expended $223,139.75 in billable time during this litigation. Hourly rates charged were $200.00 for H. Brewton Hagood, $150.00 to $165.00 for A. Bright Ariail and Kevin R. Eberle,

---

[21] As noted by the court in Barber v. Kimbrell's, 577 F.2d at 226, n.28, the twelve factors to be considered are as follows:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

Indeed, this District has established local rules which require compliance with the Barber decision. See Loc. Civ. R. 54.02, 54.03 (DSC).

$75.00 for Chip A. Bruorton, and $85.00 to $100.00 for paralegal Shannon M. Skelly. In response to Welcome's objections Meybohm has conceded that some $3,288.00 of these fees should be excluded, reducing the claimed amount to $219,851.75.

132. Welcome interposes no objection to either the rates charged or the number of hours worked. "Throughout the proceedings, counsel for Meybohm demonstrated excellence by their preparation, presentation, and cooperation." The Court fully agrees. The Court further concludes that counsel for Meybohm has significant expertise in construction litigation; has expended a large portion of the firm's time, money and energy in pursuing this action; has zealously but appropriately represented Meybohm throughout this and other controversies; and has achieved significant results for their efforts.

133. After considering the itemized bills, the absence of Welcome's objections generally, and reviewing the factors outlined in Barber v. Kimbrell's, Inc., the Court finds the hourly rates charged and the number of hours billed to be in line with prevailing rates charged in the local area and reasonable given the complexity and specialized nature of the case.

134. Welcome does object as a matter of law, however, to the taxation of certain time as recoverable attorneys' fees under Rule 54(d), 28 U.S.C. § 1920, and the South Carolina mechanics' lien statute.

135. Welcome objects to Meybohm's inclusion of all attorneys' fees billed as a result of this litigation. It notes that the South Carolina mechanics' lien statute, S.C. Code § 29-5-10(a), only permits recovery of those costs, including a

reasonable attorney's fee, "which may arise in enforcing or defending against the lien under this chapter." It asserts that a great deal of time in this litigation was spent on resolving the numerous other causes of action besides the action to enforce the mechanics' lien. "Moreover, a substantial portion of the preparation for trial, and the conduct of the trial, was dedicated to Welcome Hotels' claim for damages for breach of contract and breach of warranties."

136. Meybohm, on the other hand, argues that all other causes of action in this litigation arise out of the same dispute and series of events leading to the filing of the mechanics' lien. It asserts that it had to "carry its ultimate burden of persuasion on the causes of action presented in its counterclaim" in order to prevail and foreclose on the mechanics' lien. "The amount of the mechanic's lien filed by Meybohm represented the amount due Meybohm from Welcome Hotels and GS Partners under the contract in this case. The prosecution of the breach of contract claims, as well as the other causes of action alleged in the counterclaim, were necessary for Meybohm to show entitlement to the amount listed in the mechanic's lien. "To hold that Meybohm is not entitled to its fees for the prosecution of its underlying causes of action is to remove the force and effect of the attorneys' fee shifting provision in the mechanic's lien statute."

137. In this case, the Court agrees with Meybohm. Every one of Welcome's causes of action and Meybohm's counterclaims centered around how much of the unpaid portion of the contract amount was due in owing to Meybohm. Welcome's causes of action all centered around its entitlement to set-offs, which would reduce the amount owed to Meybohm under the Agreement. In short, there is no way to

separate the mechanics' lien cause of action from the remaining allegations; Meybohm was forced to pursue and defend each of them in order to foreclose on the mechanics' lien. Welcome's argument in this regard is rejected.

138. Welcome also disputes Meybohm's inclusion of $37,925.50 in paralegal fees. It argues that paralegal fees are actually more in the nature of "costs" than attorneys' fees, and that the initial affidavit is not specific enough to fully analyze the legitimacy of these charges.

139. Meybohm counters that paralegal time is billable as attorneys' fees and that a paralegal "reduces [the] amount of time which attorneys have to devote to a case at his or her rates and has the effect of reducing the total amount of fees which are devoted to a case such as this." Meybohm's supplemental affidavit provides a breakdown of all time billed in this action, including those of paralegals.

140. In the context of the Equal Access to Justice Act [EAJA], 28 U.S.C. § 2412(d), the Fourth Circuit has found that paralegal fees are in the nature of "fees" as opposed to "costs," but is careful to draw distinctions in the hybrid duties of a paralegal. In Hyatt v. Barnhardt, 315 F.3d 239, 255 (4th Cir. 2002), the court held that "[a]lthough fees for paralegal time may be recoverable under the EAJA, such fees are only recoverable to the extent they reflect tasks traditionally performed by an attorney and for which the attorney would customarily charge the client" (citing Jean v. Nelson, 863 F.2d 759, 778 (11th Cir. 1988)) (emphasis added). Indeed, as the Jean decision makes clear, "To hold otherwise would be counterproductive because excluding reimbursement for such work might encourage attorneys to handle entire cases themselves, thereby achieving the same results at a higher

68

overall cost." 863 F.2d at 778 (citation omitted). Cf. Charleston Lumber Co. v. Miller Housing Corp., 318 S.C. 471, 458 S.E.2d 431, 438 (Ct. App. 1995) (tacitly approving paralegal fees as part of attorney fee recovery in an action on a promissory note).

141. The Court agrees that Meybohm is entitled to recover its billing for paralegal time for those tasks which could be performed by an attorney. This, however, raises another issue which gives the Court concern.

142. From a review of Meybohm's supplemental affidavit, it is clear that time was billed by more than one attorney or paralegal for the same event. For example, there are more than two dozen references to a "conference" between and among the attorneys and paralegal, for purposes discussing strategy, organization, or the giving and receiving of instructions, for which Meybohm has been billed two or even three hourly rates. There are also billings for one attorney's writing of an e-mail with a separate billing for another attorney's reading of the same e-mail.

143. The Court is mindful that such "double-billing" is not per se improper. See Colonial Williamsburg, 38 F.3d at 139; In re General Motors Corp., 110 F.3d 1003, 1022 (4th Cir. 1997). However, the Court concludes that billing multiple hourly rates for a single discussion or conference is unreasonable in this case. It is true that the nature of a firm environment is conducive to the exchange of theories and ideas between and among attorneys – the Court does not comment negatively upon such conferences. However, the Court finds that it would simply be inequitable here to impose on Welcome the functional equivalent of a $425.00 hourly rate for every conference held among Meybohm's counsel. In re A.H. Robbins Co., 86 F.3d 364,

373 (4th Cir. 1996) ("the law of this circuit has long been clear that federal district courts have inherent power and an obligation to limit attorneys' fees to a reasonable amount").

144. Rather than conduct a line-by-line analysis of the attorneys' fees billed in this action, the Court after thoroughly reviewing counsel's submissions concludes that approximately 20% of the attorney/paralegal time billed consists of either "non-legal" paralegal time or multiple billing for the same event. Meybohm's recovery should be adjusted accordingly.

145. As such, the Court reduces Meybohm's adjusted attorneys' fees request from $219,851.75 to $175,881.40, or 80% of the amount claimed.

<h3 style="text-align:center">IV. JUDGMENT</h3>

Based on the foregoing, it is

ORDERED AND ADJUDGED as follows:[22]

1. Meybohm failed to perform in full under the Agreement;

2. As a result, Welcome Hotels is entitled to set-offs under its breach of contract cause of action in the amount of $67,468.75;

3. Welcome failed to perform in full under the Agreement;

4. As a result, Meybohm is entitled to recover damages under its breach of contract cause of action, <u>after</u> giving Welcome credit for the set-offs it is due, in the amount of $539,684.11;



---

[22] As noted earlier, Meybohm acknowledges that it must elect among its several remedies.

70

5. Welcome violated the SCIREA;

6. As a result, Meybohm is entitled to recovery under its SCIREA cause of action in the amount of $190,816.38.00, plus interest at the judgment rate until the date of this Judgment, plus reasonable attorneys' fees;

7. Meybohm properly perfected its mechanics' lien on the subject property;

8. Meybohm has proven entitlement to recovery under its mechanics' lien cause of action in the amount of $539,684.11;

9. Meybohm is entitled to prejudgment interest on this amount, at the contracted rate of 1.5% per month, from December 19, 2001 through August 8, 2004 (a total of $329,382.34 by the Court's calculation);

10. Meybohm is the "prevailing party" under the mechanics' lien statute;

11. As a result, Meybohm is entitled to recover its costs and attorneys' fees expended in enforcing its lien;

12. After reductions based upon Welcome's objections and this Court's inherent discretion, Meybohm is entitled to recover $19,851.41 in costs and $175,881.40 in attorneys' fees;

13. All other causes of action are dismissed for lack of proof; and

14. This action is ended.



**IT IS SO ORDERED.**[23]

Sol Blatt, Jr.
Senior United States District Judge

October ___, 2005
Charleston, S.C.

---

[23] This Court cannot end this Order without expressing its gratitude to its career law clerk, Brock Collins, for the hundreds of hours he spent in reviewing and analyzing the trial record, the briefs submitted by the parties, and the applicable legal principles involved, to enable the Court to prepare its final Order in this case